**STATE of Ohio, Appellee and Cross–Appellant,**

**v.**

**PEARSON, Appellant and Cross–Appellee.**

[Cite as *State v. Pearson* (1996), 114 Ohio App.3d 168.]

Court of Appeals of Ohio,
Third District, Seneca County.

No. 13–95–47.

Decided Oct. 4, 1996.

*Paul F. Kutscher, Jr.,* Seneca County Prosecuting Attorney, and Kenneth H. Egbert, for appellee and cross-appellant.

*Gene P. Murray,* for appellant and cross-appellee.

THOMAS F. BRYANT, Judge.

This is an appeal by Eric B. Pearson from a judgment of conviction and sentence entered in the Seneca County Court of Common Pleas, following a jury verdict finding appellant guilty of aggravated burglary, abduction, gross sexual imposition, felonious sexual penetration, attempted rape, and rape.

On July 14, 1994, Theresa Tiell was attacked in her home in Tiffin, Ohio by a male assailant of medium build. As Tiell slept face-down in her bed, the assailant grabbed her from behind and threatened to kill her and her four-year-old son if she did not comply with his sexual demands. The assailant restrained Tiell, removed her clothes, and placed a pillowcase over her head. He then forcibly touched her breasts and vagina and attempted vaginal intercourse in front of

Tiell's young son, JoJo. After being unsuccessful in his attempt at vaginal penetration, the assailant became angry and renewed his threats of harm to Tiell and her son. He then forced Tiell to engage in fellatio.

After the rape, Tiell preserved a sample of the assailant's semen, by spitting the ejaculate into her pillowcase. Later this semen sample was analyzed for DNA evidence and compared to blood samples obtained from appellant and other male acquaintances. After the rape, the assailant untied Tiell, removed one of his gloves, and began to caress her by touching her forehead and rubbing her face. Although he apologized for his actions, he threatened to kill Tiell's son if she contacted the police. After being in Theresa Tiell's home for approximately two hours, the assailant then told her to stay in bed and face the window while he left.

Approximately two hours after the assailant left the home of Theresa Tiell, seventeen-year-old Bethany Riley was attacked by a Caucasian male of medium build. While Riley was riding her bike on Township Road in Tiffin, Ohio, a blue Buick Park Avenue veered into Riley's lane of traffic and knocked her from her bike. A man, concealed by a dark hooded sweatshirt and a bandanna covering his face, got out of the car and approached Riley. The man began yelling at her and struck her across the face with his open hand. He then forced Riley into a wooded area and pushed her to the ground. While she was face down on the ground, the assailant restrained Riley's arms behind her back.

Riley began to struggle and was able to break free from the assailant, who later recaptured her and again forced her to lie on the ground. The assailant then told Riley to remain on the ground while he walked to his car. Riley, however, began to run and was able to escape to a nearby farm house, where she telephoned the Sheriff's Department and reported the incident.

At the time of the incidents involving Theresa Tiell and Bethany Riley, the Tiffin Police Department was in the process of investigating the rape of Stacie Schwab, which occurred on April 2, 1994. Appellant became a suspect in this rape, along with the two subsequent Tiell and Riley incidents when the police used Riley's description of the assailant's vehicle to scan the automobile records. The computer records revealed that a car matching Riley's description was registered to appellant's father, Leonard Pearson. Additionally, the police were aware of appellant's criminal history and that appellant had recently been released from state prison after serving approximately twelve years on a prior rape conviction.

Based upon this information, and the similarities between the three incidents, the police obtained and executed a search warrant upon appellant's residence and vehicle on August 22, 1994. They found several articles of dark colored clothing, including a blue hooded sweatshirt and a pair of gloves. The next day, the police sought a court order from the Seneca County Common Pleas Court to obtain a.

blood sample from Eric Pearson. The police intended to compare this blood sample with evidence collected at the scenes and from the victims of both rapes. This order was executed on September 12, 1994. Blood samples were also obtained from five other males acquainted with Tiell.

The blood samples were submitted to the Serological Research Institute for DNA analysis. The blood samples from the five male subjects and the blood sample from Theresa Tiell were subjected to genetic-marker analysis and compared with semen samples obtained from the crime scene. The results, released to the Tiffin Police Department on March 15, 1995, indicated that the semen found on Theresa Tiell's pillowcase had the same seven genetic marker types as those found in Eric Pearson's blood. Appellant was then separately indicted for the crimes committed against Tiell and Schwab. During Pearson's trial for the rape of Tiell, the state's DNA expert testified that the identified combination of genetic marker types occurs in approximately 0.000581% of the general population of Ohio or 1 in 172,000 people.

On May 10, 1995, appellant filed a motion to suppress all evidence obtained as a result of the unlawful search of himself in which blood samples were taken without a warrant. During the pendency of this motion, the state sought a warrant from the Tiffin Municipal Court to take a second blood sample from appellant on June 19, 1995. This second sample was submitted to the Serological Research Institute and subjected to the same DNA tests as the first sample. The Institute's conclusions were released to the Tiffin Police Department on July 19, 1995 and again pointed to appellant as the perpetrator of the crimes against Tiell.

On August 4, 1995, the Seneca County Common Pleas Court held a hearing on appellant's motion to suppress. In addition to his original motion, appellant filed a supplemental motion to suppress the second blood sample as a fruit of the first illegal search and as lacking probable cause. The state argued that the taking of the first blood sample pursuant to the court's order was justified under the circumstances and if the order was deemed technically incorrect, the evidence obtained pursuant to it was admissible because the DNA evidence would have been inevitably discovered during the investigation. In the alternative, the state argued that the second blood sample should be admissible at trial because it was properly obtained in accordance with a valid search warrant.

On August 16, 1995, the court denied appellant's motion to suppress. Although the court held that a search warrant should have been obtained for the first blood sample, the court concluded that this evidence was nonetheless admissible because it would have been ultimately or inevitably discovered during a lawful investigation. The court explained that since the investigating officer had knowledge of information sufficient to form a reasonable belief that the defendant

might have been the perpetrator of the two unsolved rapes, the officer would have requested a search warrant for the extraction of blood from appellant, thereby making the discovery of the DNA evidence inevitable. Furthermore, the court concluded that the warrant to obtain the second blood sample was supported by sufficient facts to establish probable cause.

On August 28, 1995 appellant was tried for the crimes committed against Schwab. During this trial, the state used the DNA evidence obtained from the analysis of the first blood sample drawn from appellant. Appellant was found guilty of one count of abduction, two counts of gross sexual imposition, one count of attempted rape, and one count of rape. Appellant appealed this decision and, *inter alia*, challenged the constitutionality of the first blood sample. See 114 Ohio App.3d 153, 682 N.E.2d 1077.

On November 6, 1995 appellant was tried for the crimes committed against Tiell. During this trial, the state utilized the evidence obtained from the DNA analysis of both blood samples. The court, however, did not permit the introduction of evidence pertaining to the rape of Schwab. Although the circumstances of the two rape incidents were similar, the court concluded that evidence of the other rape was inadmissible. In addition, the court excluded alleged alibi evidence and expert testimony as not timely disclosed.

At the conclusion of the trial, appellant was convicted by the jury and sentenced to the maximum statutory sentences for aggravated burglary, abduction, gross sexual imposition, felonious sexual penetration, attempted rape, and rape. It is from this conviction and sentence that appellant, Eric Pearson, asserts four assignments of error. In addition, the state has filed a cross-appeal and asserts two assignments of error for our review.

## I

In his first assignment of error, appellant argues that the court abused its discretion when it overruled his motion for a change of venue. Three months prior to this trial, appellant was tried and convicted for the rape of Schwab in the Seneca County Common Pleas Court. Appellant contends that the publicity surrounding this previous trial substantially interfered with his right to a fair and impartial jury and therefore entitled him to a change of venue.

In *State v. Gumm* (1995), 73 Ohio St.3d 413, 430, 653 N.E.2d 253, 269, the Ohio Supreme Court wrote:

"In reviewing this contention we are guided by established principles that the decision on changing venue rests largely in the discretion of the trial court. *State v. Fox* (1994), 69 Ohio St.3d 183, 189, 631 N.E.2d 124, 129–130. Absent a clear showing of an abuse of discretion, the trial court's decision controls. 'The

interests of judicial economy, convenience, and reduction of public expenses necessitate that judges make a good faith effort to seat a jury before granting a change of venue.' *Id.* at 189, 631 N.E.2d at 130. Further, in Ohio we recognize that the examination of jurors on their *voir dire* affords the best test as to whether prejudice exists in the community. *Id.*"

In *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, the court similarly cited and followed Fox for the propositions that (1) venue decisions rest within the sound discretion of the trial court and (2) *voir dire* affords the best test to determine whether prejudice against the defendant exists in the community. We therefore must determine whether the trial court in the case *sub judice* abused its discretion by overruling appellant's motion for change of venue.

In *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, 171, the court reiterated the law regarding what constitutes an abuse of discretion. The court stated, "The term 'abuse of discretion' * * * connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."

In the case *sub judice,* we find no abuse of discretion in the trial court's decision to overrule appellant's motion for change of venue. The record on *voir dire* established that several prospective members of the jury were exposed to pretrial publicity regarding the previous trial. These potential jurors, however, stated that they would judge appellant solely on the law and the evidence presented during this trial. The trial court made an extensive effort to ensure that a fair and impartial jury would be seated by conducting an individual *voir dire* for each member of the venire. From this individual *voir dire,* the trial court was in the best position to determine whether prejudice against appellant existed in the community.

While the record reveals that some pretrial publicity surrounded appellant's trial, he has failed to demonstrate that it interfered with the seating of a fair and impartial jury. Therefore, the court did not abuse its discretion when it denied appellant's motion for a change of venue. Accordingly, appellant's first assignment of error is overruled.

## II

In his second assignment of error, appellant argued that the court abused its discretion when it excluded his alibi evidence as not having been timely disclosed. Crim.R. 12.1 provides:

"Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, he shall, not less than seven days before trial, file and serve upon the prosecuting attorney a notice in writing of his intention to

claim alibi. The notice shall include specific information as to the place at which the defendant claims to have been at the time of the alleged offense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the purpose of proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted."

Appellant argues that the trial court should have permitted Kathy Gons and Karen Howe to testify regarding appellant's whereabouts in the early evening hours of July 13, 1994 and the morning of July 14, 1994. Although appellant filed his notice of alibi on November 7, 1995, after more than a week of trial and after the state had rested, he argues that this evidence should have been admitted to rebut the testimony of Riley. On November 13, the trial court decided to admit Riley's testimony regarding the abduction incident that occurred between 7:45 and 8:45 a.m. on July 14, 1994 because it was probative on the issue of identity. Appellant argues that this decision opened the door for defense rebuttal testimony in the form of alibi evidence.

The record reveals the following discussion between the court and defense counsel on November 10, 1995.

"The Court: * * * So, let's assume that at least Miss Riley comes in.

"Mr. Needles: Which means I have to bring other witnesses that I haven't probably discovered.

"The Court: What other, what other witnesses do you need to bring?

"Mr. Needles: Alibi witnesses.

"The Court: Alibi witnesses for the date and time?

"Mr. Needles: At a minimum I need those. And clearly at this point I think I would be calling Mr. Bates, Lt. Bates.

"The Court: So, this Court must conduct a hearing regarding the issue of alibi, regarding the issue of other acts unless you say, Judge, we don't want Miss Riley.

"Mr. Needles: No.

"The Court: You called him in this hearing. You can call whoever you want in this hearing.

"Mr. Needles: Correct.

"The Court: Regarding other acts, it's not a question of alibi. Rules don't apply.

"Mr. Needles: No, but if she is allowed, I have other witnesses.

"The Court: No. I'm not gonna—If I do that, if you want those witnesses in here you bring them in outside the hearing of the jury and I'll make a decision

whether or not the other acts testimony comes in. You're right. I'm not gonna allow a trial in a trial and I don't have to in front of this jury. I, I can make a decision whether or not I allow that other acts in in [sic] your, quote, and I'll use the term alibi although I don't think it applies to this type of hearing.

"Mr. Needles: I don't either. I don't either.

"The Court: Then I exclude the other acts. I don't let it in. If I don't find that alibi applies, I might have misstated that, then I will allow the other acts in and I'm not gonna allow any testimony regarding, quote, alibi to come in. * * *

"Mr. Needles: Do I need to bring in alibi witnesses?

"The Court: You need to bring in whoever you think you wanna bring in regarding other acts testimony even if they haven't been discovered."

On November 14, 1994, the following discussion occurred between the court and counsel:

"The Court: All right. Then let's turn to the testimony that you wish to introduce this afternoon. Is it in the nature of alibi?

"Mr. Needles: Alibi as to—only if I could be so restricted.

"The Court: I have already ruled that I'm not gonna allow it since the notice of alibi was filed so late.

"Mr. Needles: As to the testimony of, um, Bethany Riley.

"The Court: Understood. And I made it clear Friday afternoon I expected whatever testimony you had regarding other acts to be here at 7:30 Monday morning. I specifically asked you, do you have any testimony? You said, no.

"Mr. Needles: No.

"The Court: The reason I wanted that testimony at that time outside the hearing of the jury is so that I could make a determination to, whether or not the other acts testimony should be allowed even at a threshold level to go to the jury. At that time there was no testimony introduced that indicated any alibi. I'm not going to allow any testimony by the defense regarding any alibi, even as it pertains to Miss Riley. * * *"

■ It is apparent from the record that the court treated the testimony of Kathy Gons and Karen Howe as evidence in the nature of an alibi. The proffer by defense counsel, however, does not establish appellant's whereabouts during the crimes in question. The testimony of Howe in the proffer indicated that appellant left her home between 6:00 and 7:00 p.m. on July 13, 1994. The proffer relating to the testimony of Gons indicated that appellant was seen at a garage sale before noon on the morning of July 14, 1994. That evidence does not establish an alibi for appellant for the abduction incident involving Riley, since

the assault on her was committed between 7:45 and 8:45 a.m. on the morning of July 14. Furthermore, this evidence does not establish an alibi for appellant for the crimes committed against Tiell, which occurred between 3:30 and 6:00 a.m. on July 14, 1994.

Therefore, since neither Kathy Gons nor Karen Howe could account for appellant's whereabouts during the incidents involving Tiell and Riley, their testimony was irrelevant. Crim.R. 12.1 allows the admission of untimely alibi evidence if the court determines that the admission is in the interests of justice. In the present case, justice does not require the admission of evidence which does not provide an alibi. Therefore, the trial court properly excluded the testimony of Karen Howe and Kathy Gons. Appellant's second assignment of error is overruled.

### III

In his third assignment of error, appellant claims that the means used to take blood samples on September 12, 1994 and June 20, 1995 violated his constitutional rights. Specifically, appellant argues that the first blood sample and the test results obtained therefrom should have been suppressed since the sample was taken without a warrant. Appellant further argues that the second blood sample, although obtained pursuant to a valid warrant, should have been excluded because it was a product of the first illegal search and therefore a fruit of the poisonous tree.

In response to appellant's contentions, the state offers several arguments in support of the trial court's decision to admit both blood samples. The state first argues that the initial taking of blood was reasonable since it was authorized by a court order. Even if the sample was obtained by unreasonable means, the state urges this court to find that the second sample was untainted by the first under the theories of inevitable discovery, attenuation, or harmless error. The state contends that this second sample, taken by means of a search warrant, complied with the requirements of the Fourth Amendment and Crim.R. 41 and was therefore properly admitted.

Appellee's reasonableness argument is not persuasive. It is a fundamental tenet of constitutional law that a warrantless search or seizure is, *per se,* unreasonable and thereby violative of the Fourth Amendment, unless it falls within one of the specifically established exceptions to the warrant requirement. *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 586. The burden is upon the state to prove that a warrantless search or seizure is a reasonable intrusion. See *Chimel v. California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685.

While the United States Supreme Court, in *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, held that the initial taking of a blood sample does not, in itself, violate the constitutional right prohibiting unreasonable searches and seizures, absent exigent circumstances blood may be extracted from an individual only upon the issuance of a search warrant or its functional equivalent. *State v. Kutz* (1993), 87 Ohio App.3d 329, 335, 622 N.E.2d 362, 365, *Schmerber, supra.*

In the present case, the court's order to extract blood from appellant was not the functional equivalent of a warrant. The record reveals that the state's motion requesting this order contained no facts or assertions which linked defendant to any particular crime. The state merely requested "the withdrawal of blood samples in regard to a pending criminal investigation relating to felony crimes." This information is insufficient to support a magistrate's finding of probable cause.

Therefore, we find that the court's order to extract blood from appellant was invalid and the subsequent search was unreasonable and in violation of the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution. Accordingly, we find that the trial court erred when it permitted the introduction of evidence relating to this first sample.

■ Our next concern is whether the second blood sample, obtained pursuant to a warrant, was the fruit of the illegally obtained first blood sample and should therefore be excluded. The state argues that the second blood sample was the product of an independent source unrelated to the initial taking of blood. Therefore, the state contends, the second sample is not a fruit of the poisonous tree. The state's argument has merit.

In her attempt to secure a search warrant, Lt. Michelle Craig presented an affidavit to the Tiffin Municipal Court. This court was separate from the Seneca Count Common Pleas Court, which issued the first order for the withdrawal of blood. Lt. Craig's affidavit contained sixty-five paragraphs. These paragraphs contained detailed facts regarding the Schwab, Tiell, and Riley incidents and discussed appellant's involvement with several other sexual assaults and abductions. While the affidavit described how appellant became a suspect in this case, it made no mention of the DNA results obtained from the first blood sample.

Since the court examining these facts and issuing the warrant was independent and was not informed of the first set of DNA results, we find that the evidence obtained from the second search was properly admitted and not fruit of the first illegal withdrawal of blood.

In addition to its independent-source argument, the state offers the doctrine of inevitable discovery as a basis for the admission of the blood evidence. This

doctrine provides an exception to the derivative-evidence rule, under which evidence is barred from use by the prosecution if it was obtained as a result of the initial illegality. Having held that the second set of blood evidence was obtained by an independent source untainted by the first illegal search, we find that the inevitable-discovery rule does not apply.

■ The state also contends that the inevitable-discovery rule should render the evidence obtained from the first search admissible because this evidence would have been ultimately discovered by lawful means during the investigation. The state argues that had the court order not been requested, Lt. Craig would have obtained a search warrant. Therefore, the state contends that via the search warrant, Lt. Craig would have inevitably discovered the same DNA evidence.

We reject this argument and follow the precedent we established in *State v. Masten* (Sept. 29, 1989), Hancock App. No. 5–88–7, unreported, 1989 WL 111983. In this case, we held:

"[T]he mere fact that a search warrant would in all probability have been issued on request cannot be considered as the implementation of investigative procedures that would have ultimately led to 'inevitable' discovery of the evidence. It seems to us that any other interpretation would pose a significant threat to the Fourth Amendment warrant requirement with its corollary magisterial determination of probable cause."

Similarly, in *United States v. Griffin* (C.A.6, 1974), 502 F.2d 959, the Federal Court of Appeals held:

"The assertion by police [after an illegal entry and after finding evidence of crime] that the discovery was "inevitable" because they planned to get a search warrant * * * would as a practical matter be beyond judicial review. Any other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment."

Because we believe the same rationale applies in the present case, we find appellee's argument of inevitable discovery to be without merit.[1]

■ Having found that the first blood sample and the DNA tests obtained therefrom should have been suppressed, we must decide whether the admission of this illegally obtained evidence requires reversal. To this end, we must

---

1. See, also, *United States v. Buchanan* (C.A.6, 1990), 904 F.2d 349; *United States v. Satterfield* (C.A.11, 1984), 743 F.2d 827, 846 (the fact that a search warrant was obtained after illegal warrantless search does not permit application of the inevitable-discovery doctrine, "[b]ecause a valid search warrant nearly always can be obtained after the search has occurred").

consider whether the admission of the first blood sample, in violation of appellant's constitutional rights, constitutes harmless error.

In *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, the United States Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Although the court, in *Harrington v. California* (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284, claimed to reaffirm the *Chapman* standard, it focused on the probable impact the tainted evidence had on the jury. The court held that although the introduction of the confessions of two codefendants who did not take the stand violated *Bruton v. United States*,[2] it constituted harmless error because the two confessions were merely cumulative and the case against the petitioner was overwhelming. The court explained:

"It is argued that we must reverse if we can imagine a single juror whose mind might have been made up because of [the codefendants'] confessions and who otherwise would have remained in doubt and unconvinced. We of course do not know the jurors who sat. Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury."

Following this rationale, many courts that find error in the admission of evidence to be harmless follow one of two theories: overwhelming evidence of guilt[3] or the cumulative nature[4] of the disputed evidence. Furthermore, when the tainted evidence is identical in kind to other validly admitted evidence the tainted evidence may be deemed cumulative and therefore harmless.[5] This is the

---

2. (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.

3. See, *e.g.*, *United States v. Posey* (C.A.7, 1981), 663 F.2d 37 (harmless error where other evidence connecting defendant to robbery was convincing and overwhelming); *State v. Sheriff* (1980), 190 Mont. 131, 619 P.2d 181 (harmless error merely because other evidence would support conviction), *State v. Wetsch* (N.D.1981), 304 N.W.2d 67 (harmless error is shown if properly admitted evidence would sustain the jury's verdict); *State v. Brown* (1992), 65 Ohio St.3d 483, 605 N.E.2d 46 (admission of drug evidence found in defendant's car harmless because other drugs lawfully found).

4. See, *e.g.*, *Gant v. United States* (D.C.App.1986), 518 A.2d 103 (illegally obtained evidence harmless as cumulative of much other evidence); *State v. Pinegar* (Mo.App.1979), 583 S.W.2d 217 (erroneous admission of drugs was harmless error because the drugs were of equal weight for the trier of fact as the confession).

5. See, *e.g.*, *People v. Threkeld* (1973), 47 Mich.App. 691, 209 N.W.2d 852 (admission of gun in evidence was harmless because three revolvers were properly admitted); *State v. Brockman* (1989), 231 Neb. 982, 439 N.W.2d 84 (money found in sock harmless since other money lawfully found on person); *Fite v. State* (Okl.Crim.App.1993), 873 P.2d 293 (admission of marijuana seized in illegal search harmless as court properly admitted other evidence of other marijuana); *People v. Terry* (1977), 80 Mich.App. 299, 263 N.W.2d 352 (since second piece of

situation with which we are faced in the present case. The Seneca County Court of Common Pleas permitted the admission of two blood samples and two sets of DNA results. The state's expert testified that the two blood samples contained the same genetic markers and that the analysis of these samples produced the same DNA evidence. This evidence pointed to appellant as the perpetrator of the crimes against Tiell.

The state argues that while it may have been error to admit the first blood sample and the test results derived therefrom, the error was harmless since the evidence was identical to the properly admitted evidence from the second blood sample. We find this argument to be problematic.

An admission of illegally seized evidence is not harmless, even if irrelevant to defendant's guilt, if it was important to the jury's deliberations. *Clemons v. State* (Tex.Crim.App.1980), 605 S.W.2d 567. In assessing the importance of the improperly admitted evidence, the court should consider whether the prosecutor made comments which highlighted the significance of that particular piece of evidence. *See LaFave, Search & Seizure* (1996) 434, Section 11(f). Even if the evidence is not crucial for a determination of guilt, the emphasis which it received at trial may be such that a finding of prejudice is appropriate. *See State v. Duntz* (1992), 223 Conn. 207, 613 A.2d 224.

In the present case, the state's use of the two blood samples bolstered the reliability of the DNA tests. If the DNA results were identical on the two tests, the only logical reason for offering these results twice was to enhance the state's argument of identity. The state went to great lengths to show that each of the blood samples pointed to appellant as the perpetrator of the crimes against Theresa Tiell and that the results of each of the tests were consistent with the other. The DNA expert testified that after he completed his genetic-marker analysis on the second sample, he was asked to compare it to the first sample he received. He further testified that results of his tests indicted there was "absolute continuity both within the blood samples and also with the sperm donor." Furthermore, in closing argument, the prosecutor made the following statement,

"So, if you just look at the physical evidence itself, the DNA evidence extracted from the pillowcase compared with the DNA extracted from the appellant's blood; *not once but twice,* you have an identification * * *." (Emphasis added.)

Following the standard established in *Chapman v. California, supra,* our judgment regarding harmless error must be based on our own reading of the

evidence had been obtained properly and proved the same facts as the first piece of evidence obtained in warrantless search, the admission of the first evidence was harmless).

record and on what seems to have been the probable impact of the illegally obtained evidence. In the circumstances of the present case, we cannot say that the admission of the first blood sample and corresponding DNA results was harmless beyond a reasonable doubt. By admitting evidence relating to both blood samples, the court permitted the state to corroborate its evidence of identity with evidence obtained in violation of the Fourth Amendment. Therefore, since the court's actions constituted prejudicial error, we sustain appellant's third assignment of error.

## IV

Appellant's fourth assignment of error argues that the court abused its discretion when it excluded the testimony of the defense DNA expert, Thomas Eggers. Although defense counsel had been in contact with Eggers for over a month prior to trial, counsel did not disclose that Eggers would be called as a witness until the third day of trial. Because the court determined that counsel acted in bad faith and willfully violated the discovery rule it excluded Eggers's testimony as a sanction for this violation.

If a party has failed to comply with the discovery requirements set forth in Crim.R. 16, the trial court may grant a continuance, prohibit the party from introducing into evidence the material not disclosed, or make such other order as it deems just under the circumstances. *Middletown v. Campbell* (1990), 69 Ohio App.3d 411, 419, 590 N.E.2d 1301, 1306. A trial court must inquire into the circumstances producing the alleged violation of Crim.R. 16 and then impose the least severe sanction that is consistent with the purpose of the rules of discovery. *Lakewood v. Papadelis* (1987), 32 Ohio St.3d 1, 511 N.E.2d 1138, paragraph two of the syllabus. The discovery rules exist to produce fair trials. *State v. Thiesen* (Jan. 31, 1990), Athens App. No. 1403, unreported, at 5. Therefore, the court should impose the appropriate sanction to effectuate this purpose.

In the present case, the trial court inquired about the circumstances surrounding the violation. In determining whether the violation was willful or in bad faith the court considered when defense counsel contacted the expert. Finding that the defense had been in contact with Eggers over a month prior to trial without disclosing his name, the court concluded that a willful violation involving bad faith had occurred. Although the court excluded Eggers's expert testimony, it permitted him to be present at the defense table and assist counsel during the examination of the state's DNA expert.

The trial court has discretion to impose sanctions for failure by the parties to provide discovery as required by Crim.R. 16, and a reviewing court will

not reverse unless the trial court's decision was unreasonable, unconscionable, or arbitrary. *State v. Parson* (1983), 6 Ohio St.3d 442, 445, 6 OBR 485, 487, 453 N.E.2d 689, 691–692. After reviewing the record, we find that the court's exclusion order was a proper sanction. Although Eggers was not permitted to testify, appellant's right to present a defense was preserved since the court permitted Eggers to assist defense counsel during the examination of the state's DNA expert. Therefore, we find that the court's sanction was appropriate and consistent with the purpose of the discovery rules.

Appellant's fourth assignment of error is without merit.

## V

In its cross-appeal, the state asserts two assignments of error. The state first argues that the court erred when it excluded evidence of identity by limiting the testimony of the abduction victim, Bethany Riley. The court permitted Riley to testify about the circumstances surrounding the abduction, but prevented her from identifying her assailant as the same man she had observed in the courthouse during the other-acts hearing, approximately one month prior to trial. While in the courthouse, Riley saw appellant leave an elevator wearing jail clothes and restrained with handcuffs and leg irons. After observing his build, face, and eyes, Riley identified appellant as the man who attacked her. While she was permitted to make this identification during the hearing, the trial court excluded this testimony from the trial.

The admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. The court's decision will not be disturbed unless the court's attitude was unreasonable, arbitrary or unconscionable.

Riley testified that during the abduction, the assailant was disguised by a dark hooded sweatshirt pulled to his eyebrows and a bandanna covering his face. Therefore, since Riley was only able to see his eyes she could not give a complete description of her assailant. It was not until her confrontation with appellant in the courthouse that she was able to identify him as her attacker. The court correctly determined that the inherently prejudicial and suggestive effect of appellant's attire as well as the circumstances surrounding the confrontation diminished the reliability of Riley's identification. We therefore find no abuse of discretion in the court's exclusion of this identification. Cross–appellant's first assignment of error is overruled.

## VI

The state's second assignment of error asserts that the court abused its discretion when it precluded the other-acts testimony of Stacie Schwab. The

state sought to introduce testimony regarding appellant's prior adjudicated crimes because they were arguably similar to the crimes committed against Theresea Tiell.

It is well established that "an accused can not be convicted of one crime by proving he committed other crimes or is a bad person." *State v. Jamison* (1990), 49 Ohio St.3d 182, 184, 552 N.E.2d 180, 183. Thus, evidence that an accused has committed wrongful or criminal acts wholly independent of the crimes with which he is charged is inadmissible for the purpose of proving that the accused has a propensity toward the commission of crime. *State v. Curry* (1975), 43 Ohio St.2d 66, 68, 72 O.O.2d 37, 38, 330 N.E.2d 720, 723, Evid.R. 404(A).

The general rule denying admission of other-acts evidence is, however, subject to certain exceptions. Evid.R. 404(B) states:

"Evidence of the other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The focus of the inquiry into the admissibility of other-acts evidence is whether the evidence is being offered for the impermissible purpose of proving that the accused acted in conformity with his or her criminal character in committing the charged offenses, or whether the evidence is being offered for another purpose.

R.C. 2945.59 is in accord with the exceptions contained in Evid.R. 404(B) and provides:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

Because Evid.R. 404(B) and R.C. 2945.59 contain exceptions to the common-law rule that such other-acts evidence is inadmissible, both provisions must be construed strictly against the admissibility of such evidence. *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

The Ohio Supreme Court has held that if there is substantial proof that the alleged other act was committed by the defendant and the evidence does in fact tend to prove motive, opportunity, intent, preparation, plan, knowledge, identity,

or absence of mistake or accident, then evidence of the other act may be admissible. *State v. Lowe* (1994), 69 Ohio St.3d 527, 530, 634 N.E.2d 616, 618–619, citing *State v. Broom, supra.* It is not disputed that there is substantial proof that appellant committed the crimes against Schwab. The question remains, however, whether these crimes tend to prove any of the enumerated purposes of Evid.R. 404(B).

The state argues that the other-acts evidence should have been admitted to establish identity. In *State v. Lowe,* supra, the Supreme Court described two situations in which other acts can be evidence of identity. First are those acts which form part of the immediate background of the alleged act and are inextricably related to the crime. Second, the court stated:

"Other acts may also prove identity by establishing a *modus operandi* applicable to the crime with which a defendant is charged. 'Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B).' *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus. ' "Other acts" may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that distinct, identifiable scheme, plan, or system was used in the commission of the charged offense.' *State v. Smith* (1990), 49 Ohio St.3d 137, 141, 551 N.E.2d 190, 194. While we held in *Jamison* that 'the other acts need not be the same as or similar to the crime charged,' *Jamison,* syllabus, the acts should show a *modus operandi* identifiable with the defendant. *State v. Hutton* (1990), 53 Ohio St.3d 36, 40, 559 N.E.2d 432, 438.

"A certain *modus operandi* is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator. Other-acts evidence is admissible to prove identity through the characteristics of acts rather than through a person's character. To be admissible to prove identity through a certain *modus operandi,* other-acts evidence must be related to and share common features with the crime in question." *Id.* at 531, 634 N.E.2d at 619-620.

The circumstances surrounding the rapes of Schwab and Tiell contain many similarities. Both rapes were committed in the same area of Tiffin, Ohio within a three-month period by a white male of medium build. Both victims were alone in the dark when they were attacked from behind and threatened with physical harm. After being stripped of their clothing, both victims had their faces covered by a gloved assailant. The perpetrator then began the same series of sexual offenses against the victims. In both cases, the assailant was unsuccessful in his first attempts at rape; however, once he became angry and engaged in more threats he was able to complete the crimes. After the rapes, the assailant

became apologetic, physically caressed his victims, and warned them against contacting the police.

These similarities provided a behavioral fingerprint which could have been used to identify appellant as the perpetrator of the crimes against Theresa Tiell. Therefore, the trial court should have admitted the other-acts evidence regarding the rape of Schwab. It is obvious from the record that the court was concerned with Schwab's reluctance to testify. She and her attorney stressed the physical and emotional trauma her testimony would cause her. While this court recognizes the difficulty rape victims face when they are asked to testify against their assailants, this fact does not diminish the victim's civic duty.

The trial court stated that due to the lapse of time between the rapes of Schwab and Tiell, it did not find a sufficient nexus between the two incidents. Based upon the numerous similarities between the rapes of Schwab and Tiell, we conclude that this finding was unreasonable. We therefore sustain cross-appellant's second assignment of error.

Having sustained appellant's third assignment of error, we reverse the judgment of conviction entered by the Seneca County Court of Common Pleas and remand this case for proceedings not inconsistent with this opinion.

*Judgment reversed.*

SHAW, J., concurs.

EVANS, J., dissents.

EVANS, Judge, dissenting.

I agree with the majority's treatment of the two cross-assignments of error. However, I respectfully dissent in this case because I believe the trial court was correct in applying the ultimate-discovery exception to the exclusionary rule and refusing to suppress the evidence derived from the improperly obtained blood sample. I do so for the same reasons set forth in my dissent in *State v. Pearson* (1996), 114 Ohio App.3d 153, 166, 682 N.E.2d 1077, 1085, decided today.

In addition, the blood test obtained pursuant to a warrant was "obtained independently of the tainted source," since evidence from the first blood sample was not used to justify the issuance of the search warrant.