This appeal is taken by defendant-appellant Jacob William Fox from the judgment of the Court of Common Pleas of Wyandot County finding him guilty of felonious sexual penetration.
On September 18, 1995, Fox and his fiancee, Suzanne Weaver, took Samantha to the hospital because she was bleeding from her vaginal area. Samantha was treated at Blanchard Valley Hospital for the injury, which required surgery. Samantha was released that evening and went home with her father, Keith Weaver. The treating physician suspected the injuries were the result of sexual abuse and notified Wyandot County Children's Services, which conducted an investigation. No one from Wyandot County Children's Services testified at Fox's trial and the results of its investigation are not in the record before us.
On September 20, 1995, Samantha was playing at the home of her grandmother, Shirley Weaver. Shirley asked Samantha if she liked Fox and Samantha allegedly replied no. When asked why, Samantha allegedly stated that Fox was responsible for her injuries. Keith then took Samantha to the Medical College of Ohio (MCO). While they were alone in the examining room, Samantha allegedly told Keith that Fox had caused her injuries.
On November 29, 1995, Fox was indicted on one count of felonious sexual penetration in violation of R.C. 2907.12(A). The trial began on February 2, 1998, and continued through February 13, 1998. On February 13, 1998, the jury returned a verdict of guilty and Fox was sentenced to the mandatory term of life imprisonment.
Fox raises the following assignments of error.
 The trial court erred to Fox's prejudice by excluding expert testimony from a psychologist on the reliability of child disclosures of sexual abuse.
 The trial court erred to the prejudice of Fox by admitting into evidence, hearsay statements by the child identifying Fox as the person who caused her injury.
 Fox's conviction of felonious sexual penetration is against the weight of the evidence.
 The trial court erred to the prejudice of Fox by excluding expert testimony and reports analyzing the child's diaper because of a break in the chain of custody.
 The trial court erred to the prejudice of Fox by allowing the State to present, in its case-in-chief, a defense retained expert.
 The evidence is insufficient to convict Fox of the finding that he committed felonious sexual penetration by force of threat or force under R.C. 2907.12(B).
In the first assignment of error, Fox claims that the trial court erred by excluding expert testimony on the reliability of Samantha's statements to her grandmother and father.
 A witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test or experiment was conducted in a way that will yield an accurate result.
Evid.R. 702.
In this case, the state introduced the testimony of four expert witnesses concerning Samantha's injuries. One of these witnesses was Dr. David Gemmill, a pediatrician from MCO and a member of the Governor's Task Force on the Investigation of Child Sexual Abuse and Child Abuse. Dr. Gemmill testified that he had not examined Samantha, but had reviewed the photographs taken by Dr. Tong. From these photographs, Dr. Gemmill testified that Samantha's injuries were consistent with sexual abuse.
During cross-examination, Dr. Gemmill, as an expert on the investigation of sexual abuse, was questioned concerning the proper method of doing an exam to determine if sexual abuse had occurred. Dr. Gemmill was also questioned on the necessity of taking an accurate history.
On redirect, Dr. Gemmill testified as follows.
 [Mr. Hord]: How many child abuse cases of a sexual nature have you been involved in?
 [Dr. Gemmill:]: I don't have an exact number. I can best calculate that over the past ten years I have evaluated in excess of two thousand children. 80 percent, I think I entered that figure earlier, 80 percent of who would be female. Although the majority of them certainly do not come to this venue. Perhaps another 40 to 50 have been brought to the courtroom with my involvement.
 * * *
 Q: In the course of doing these, your involvement you talk with the children?
 A: As I think I stated earlier we limit our conversation with the children was of this issue of contamination or too much interviewing. [sic]. We generally perceive that as the primary duty of the caseworker/investigator whose job it is to conduct — part of their job is to conduct something resembling what you would call a forensic interview.
 Q: Are you familiar with the concept of delayed reporting?
 : Well, we've expected for years since —
 Mr. McNamee: Objection your Honor. That is beyond the scope of cross-examination. It wasn't raised in direct.
 The Court: I don't believe we talked about history and that kind of thing which would almost in talking with the child bring that into the gambit.
 Mr. McNamee: At the initial interview, first history he is talking about delayed report which is a later interview.
 The Court: He has a right to explain why on the history part. Go ahead, Doctor, you may answer.
 * * *
 [Mr. Hord]: Are you familiar with the concept of delayed reporting?
 [Dr. Gemmill]: Oh, yes.
 Q: What is your familiarity with that concept?
 Mr. McNamee: Objection, same objection.
 The Court: Noted, overruled. You may answer.
 A: As far as delayed reporting I think we would regard it as the norm. In most child abuse cases they come to light definitely after the fact. This case is somewhat unusual in the fact, of course, the whole issue presented earlier because of the immediate effects of the event. However, children and one reason we don't particularly even look to get a piece of history immediately in a child like this is that they are severely upset by the event that they don't even want to talk about it. This is something that you are not going to get out of a child.
 * * *
 Q: In your training and experience and expertise in handling this number of cases, are you familiar with any concept of reliability on the first statement that the child would make?
 * * *
 A: I think that is — that implies — it is with my previous answer. The fact that we don't want to ask questions repeatedly because of contamination the first disclosure is going to be the best one, but if you continue to prod and get that disclosure, as I said earlier in my testimony, that children learn to say the things that the big people want to hear. So first statements, yes, certainly are important. They are important certainly in the doctor's office if they happen to be made there.
During recross-examination, the following testimony was given.
 Mr. McNamee: The statement, if in this hypothetical, the statements were to the effect that responding to questions that the child denied that anyone had placed an object in her, that anyone had touched her in any way, that anyone had put any body part up inside of her, that she even knew how the injury occurred, those statements all of which to which she replied none of that happened to multiple people that I just gave you in a hypothetical?
 A: And your question is?
 Q: Given that she replied no in various interviews to questions like that, depending upon the person, what is your opinion now given that the first statements by a child are most likely to be the most accurate?
 A: Said the first disclosure is accurate, but disclosure we know comes quite late many times. So that a denial is almost the norm.
 Q: So it is your position professionally, what we do when we do interview is we discard every statement the child makes which says that no one injured her until finally we get to a statement at some time that says that she was injured, is that what you consider to be a valid and reliable technique?
 A: I'm afraid that's what we all do because we know disclosures come quite late. To expect to get a disclosure out of a child even acutely is probably naive.
Transcript pp. 759-784. With this testimony, the State presented ostensibly scientific evidence asserting why Samantha's later statements incriminating Fox were more reliable than her initial ones concerning other causes of her injury.
 In Boston, [the Supreme Court of Ohio] held that "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." To allow an expert to so testify, this court held, "infringe[s] upon the role of the fact finder, who is charged with making determinations of veracity and credibility." This court emphasized that "in our system of justice, it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses." We do not retreat from those statements in this case.
State v. Gersin (1996), 76 Ohio St.3d 491, 493, 668 N.E.2d 486,488, citations omitted. In this case, Dr. Gemmill testified that, in his experience, delayed disclosure of sexual abuse is the norm for children and that all prior denials should be disregarded as inaccurate. Prior to Dr. Gemmill's testimony, no testimony had been given that Samantha had made any statements, contradictory or otherwise, concerning the abuse and Dr. Gemmill was not presented with a hypothetical situation upon which to base his opinion. Without a proper basis on the record, Dr. Gemmill's testimony violates Evidence Rule 703, which requires the basis of all expert testimony be those perceived by the witness or admitted in evidence at the hearing. In addition, Samantha did not testify at the trial, so the question of her behavior at this time was not an issue. The purpose of Dr. Gemmill's testimony was to validate the hearsay statements of identification later admitted. This violates the spirit of the Supreme Court's ruling in Boston. However, this violation does not rise to the level of plain error. Absent an objection, we cannot reverse on this basis.
This leads us to the question raised by the assignment of error. Dr. Gemmill offered his expert opinion that all denials should be ignored once the child admits that the abuse has occurred. Dr. Gemmill also testified as to the proper manner in which one questions the children. Once a scientific theory concerning the detection of truth is placed into evidence, Fox had the right to rebut it. Questions about the proper procedure for obtaining information is relevant and testimony on the protocols is relevant and admissible as expert testimony.State v. Gersin (1996), 76 Ohio St.3d 491, 668 N.E.2d 486.
 [M]ost jurors are unaware of how such child abuse experts arrive at their conclusions. Necessarily, in child sexual abuse cases, experts must rely on the version of events given to them by small children. Special interviewing processes are necessary to get information from child victims, who are often immature, inarticulate, frightened, and confused about the abuse they have received. Most jurors lack the knowledge of accepted practices in interviewing child victims, and expert testimony on the issue is therefore admissible.
 * * *
 An expert testifying as to interviewing protocols does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination. * * * A major distinguishing aspect of a child sexual abuse case is how the victim came to relate the facts which led to the bringing of criminal charges. A defendant not only should be able to cross-examine prosecution witnesses regarding how they obtained their information, but also should have the chance to present expert testimony as to how such information is ideally obtained. Prosecutors are free to cross-examine, or to question the idea that there is only one blanket method of interviewing that should be applied to every child.
Id. at. 494-95, 668 N.E.2d at 488.
Here, the State was permitted to present its evidence concerning the proper method of getting information, but Fox was denied the right to present his own expert. Fox's expert, Dr. Hembrooke, proffered testimony presenting her opinion as an expert witness and met all the criteria of Evid.R. 702.[1] Dr. Hembrooke testified to doing extensive research in the area of memory of children. This research included controlled experiments conducted by standard scientific procedures. In her proffer, Dr. Hembrooke testified that the initial statement made by a child as to what has occurred is more accurate than subsequent statements. Dr. Hembrooke testified that a child's story can change over time as he or she realizes the expectations of the adult asking the questions. In addition, Dr. Hembrooke said that the child may not only change his or her story, but may even believe that the changes suggested actually occurred. As rebuttal to Dr. Gemmill's testimony, Dr. Hembrooke's testimony should have been admitted to assist the jury in its decision on this critical issue. By denying Fox the opportunity to rebut the testimony presented by the State, Fox was denied a fair trial. The first assignment of error is sustained.
In the second assignment of error, Fox claims that the trial court erred by admitting the hearsay statements of identity. The first statement was made two days after the incident. Samantha was playing on the floor and Shirley was asking her questions about whom she liked. When asked if she liked Fox, Samantha said no. Shirley then asked Samantha why and Samantha said he did it. Shirley then asked what he did and Samantha pointed to herself and again said he did it. Shirley then asked Samantha if she meant her "booboo" and Samantha said yes. Transcript p. 1040. Defense counsel objected to this statement, but the objection was overruled as the trial court ruled that it was an excited utterance.
An excited utterance "is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). To qualify as an excited utterance, one must consider the lapse of time between the event and the declaration, the mental and physical condition of the declarant, the nature of the statement, and the influence of intervening circumstances. In this case, the statements to Shirley were in response to questions and made almost two days after the incident. The child had been in a safe environment since leaving the hospital. There is no testimony that the child was agitated in any manner. To the contrary, the child was calmly playing and responding to questions from the grandmother. Shirley even testified that she asked if Samantha liked Fox just to see what the answer would be. Finally, Samantha had just spent a significant amount of time with Keith, who testified that he suspected Fox had molested Samantha when he went to the hospital. Under these circumstances there is no inherent reliability in the statement and no indication that Samantha was under the stress of excitement from the event when the statement was made. Thus, the statement is not an excited utterance.
The second statement was one made to Keith at MCO when he took Samantha for a second examination two days after the initial visit to Blanchard Valley. According to Keith's testimony, Samantha did not want to have the exam and was fighting with him and the nurse. When he was alone in the room with Samantha, she allegedly stated that Fox did it and asked why she had to have the exam. The trial court found this to be an excited utterance because Samantha was upset at the time she made it. However, this statement was not made under the excitement of the event about which the statement was made. Instead, the excitement is caused by the medical staff trying to examine the child. Additionally, the statements were made after the child had time to calm down and after spending two days with her father, who already suspected Fox. These circumstances do not indicate a situation with a guaranty of trustworthiness. Thus, the statements should not have been admitted.[2] However, the trial counsel failed to object to the admission of this statement, so the error is not preserved for appeal and does not rise to the level of plain error.
In assessing the importance of the improperly admitted evidence, the court should consider the probable impact of the tainted evidence on the jury. State v. Pearson (1996), 114 Ohio App.3d 168, 682 N.E.2d 1086. Here, the statements made by Samantha to her father and grandmother were the only pieces of direct evidence that Fox committed the offense. We cannot say that the admission of the hearsay statement was harmless beyond a reasonable doubt. The second assignment of error is sustained as to the first statement and overruled as to the second statement.
For the third assignment of error, Fox claims that the conviction was against the weight of the evidence. In support of this claim, Fox points to the contradictions in the medical testimony. However, three of the four doctors concluded that Samantha's injuries were caused by sexual abuse. Dr. Tong testified that the injury occurred three to four hours before he saw Samantha. The evidence indicates that Fox was the only adult present with Samantha when the injury occurred. Finally, Keith testified that Samantha told him at MCO that Fox caused the injury, which was admitted without objection. Thus, the jury could conclude that Fox was the one who caused the injury. The third assignment of error is overruled.
The fourth assignment of error claims that the trial court erred by admitting the diaper, but excluding the expert testimony concerning the diaper due to a break in the chain of evidence. The trial court ruled that since the chain of custody was broken, any tests done on the diaper after the break should be excluded. Chain of custody is part of the authentication and identification mandate for the admission of evidence. State v.Brown (1995), 107 Ohio App.3d 194, 668 N.E.2d 514, syllabus. The burden regarding the chain of custody only requires that the party establish that it is reasonably certain that substitution, alteration or tampering did not occur. Id. Once this burden is met, the evidence is admissible and the break in the chain of custody goes to the weight of the evidence. Id. In this case, the trial court found the identification and authentication of the diaper to be sufficient for the admission of the diaper. Thus, the expert testimony should have been admitted as well. The fourth assignment of error is sustained.
In the fifth assignment of error, Fox claims the trial court erred by permitting the State to use a defense retained expert in its case-in-chief. However, the record does not reveal any evidence that the witness was retained by the defense. The only testimony on the matter is that the witness was initially contacted by Fox's attorney and asked to render an opinion, which the witness did. There is no evidence that the witness was contacted by the defense at any time after the report was sent or that the witness was scheduled to testify for the defense. In addition, there was no confidential or privileged information provided to the witness. Thus, the State's calling of the witness did not prejudice Fox. The fifth assignment of error is overruled.
The final assignment of error claims that the evidence is insufficient to find that Fox committed the offense by force or threat of force under R.C. 2907.12(B).
 A person in a position of authority over a child under thirteen may be convicted of rape of that child with force pursuant to R.C. 2907.02(A)(1)(b) and (B) without evidence of express threat of harm or evidence of significant physical restraint.
State v. Dye (1998), 82 Ohio St.3d 323, 695 N.E.2d 763, syllabus. In this case, Fox was the caretaker at the time the injury allegedly occurred and Samantha was four years old. In addition the injury suffered resulted in heavy bleeding and two of the State's expert witnesses testified that force was necessary to cause the injuries seen. Given this evidence, the jury could reasonably find that the force requirement was met. The sixth assignment of error is overruled.
The judgment of the Court of Common Pleas of Wyandot County is reversed and the cause is remanded for further proceedings in accordance with this opinion.
Judgment reversed and cause remanded.
HADLEY and KERNS, JJ., concur.
KERNS, J., retired, of the Second Appellate Judicial District, sitting by Assignment in the Third Appellate Judicial District.
[1] Dr. Hembrooke testified that her opinions were based upon years of research and testing. The results were then applied to the hypotheticals given to her. Dr. Gemmill's opinion seems to be based on anecdotal evidence that everything said before disclosure of the abuse is false, which presupposes that abuse really did occur.
[2] Although the statements were not excited utterances, they might have been admitted under Evid.R. 807 if the proper requirements were met. However, the required findings and procedures were not completed in this case, so the testimony may not be admitted under Evid.R. 807.