THE STATE OF OHIO, APPELLEE, *v.* McGREW, APPELLANT.

(No. 346—Decided February 5, 1971.)

Mr. *Donald L. Jones*, prosecuting attorney, for appellee.

Mr. *Paul T. Theisen*, for appellant.

GRAY, P. J. This cause is in this court on appeal from a conviction of defendant on two counts of breaking and entering in the night season. Defendant feeling aggrieved by this result of his jury trial filed his notice of appeal and assigned the following errors.

"1. As to the first count, the judgment of the court is contrary to law and manifestly against the weight of the evidence.

"2. As to the second count, the court erred in granting,

over objection by counsel for the defendant-appellant a pre-trial motion by the Prosecuting Attorney for plaintiff-appellee, requiring defendant-appellant to submit to the extraction of blood samples from him.

"3. As to the second count, the court erred in admitting into evidence, over objection of counsel for defendant-appellant, samples of blood taken from the scene of the alleged crime, which samples were impure, dried and remote as to the time taken and as to the time tested, were therefore without proper foundation and incompetent as evidence.

"4. As to the second count, the judgment of the court is contrary to law and manifestly against the weight of the evidence.

"5. Defendant-appellant was intoxicated to the extent that it was impossible for him to have conceived such specific intent to steal as is a requisite element of the offense charged in the first and second counts."

We will now address ourselves to the first and fourth assignments of error. We do not believe that they are well taken. On the first count, defendant is charged with breaking and entering Voll's Cafe with intent to steal property of value therein.

The record shows that one Molly Harris, a waitress at Voll's Cafe who lives over the cafe, located in Marietta, sometime after 1 a. m. on January 20, 1970 heard a noise like the breaking of glass in the cafe. She called the police. Officer Phillis responded and in less than a minute he was at Voll's Cafe. Phillis saw only one person nearby and he was about 35 feet away from the cafe. This person was the defendant. The police officer ordered defendant to stop and searched the premises. He then interrogated defendant who had taken a seat in his car parked nearby.

The officer upon looking in the car, observed four new knives lying on the seat. They proved to be Bokar Tree Brand knives. It was established by the evidence that on that night Hopp's Feed Store, located in Marietta, had been broken into and six knives of the same brand taken.

The police officer observed underneath the car a bottle

of calvert whiskey with a pour spout on it. The surface of the street underneath the pour spout was wet.

Defendant was placed under arrest and taken to the police station. There it was observed by police officers that defendant's arm was bleeding and that there was a piece of glass in the wound. Defendant attempted to escape and took a swing with his fist at the desk officer.

At Voll's Cafe a bottle of Calvert's whiskey with an unusual pour spout on it similar to those used in Voll's Cafe was missing, as well as the change that was left in the cash register.

A report came to police headquarters that Hopp's Feed Store had been broken into. The premises were investigated and it was observed that there was blood on the door, on a piece of glass and on a piece of straw.

Here, we have evidence that defendant was the only person observed near the scene of the breaking and entering at about the time it occurred. He had suffered cuts by reason of broken glass. Underneath the car was a bottle of calvert whiskey with an unusual pour spout on it. This was the same brand of whiskey with the same type of unusual pour spout on it that was used by the owner of Voll's Cafe.

Defendant is charged with breaking and entering Hopp's Feed Store the same night. Four knives of the same brand as the six knives missing from Hopp's Feed Store were on the front seat of the car in which defendant was sitting when he was apprehended.

A blood sample was taken from defendant without his consent and over his objection. It was analyzed by the Bureau of Criminal Identification and the blood taken from the feed store was determined to be type B, the same type as that taken from defendant and the same type as on the sweater defendant was wearing.

Some of the evidence introduced in this case was circumstantial.

The use of circumstantial evidence is permitted because it is capable of producing the highest degree of moral certainty. This is no doubt due to the fact that crimes

of any magnitude are rarely committed without affording vestiges by which the offender may be traced, and very often the means he adopts for his security turn out to be the most cogent argument of his guilt. See *Hess* v. *State,* 5 Ohio 5, 10. So it is in the present case.

Evidence is none the less effective because it is circumstantial if it be consistent, connected and conclusive. It must be remembered that the large portion of this case is proved by direct evidence.

Circumstantial evidence of probative value is the handmaiden of truth.

When the evidence in a criminal case tends to sustain all the essential elements charged in the indictment, it is error for the trial court to withdraw the case from the jury and discharge the defendant. *State* v. *Axe,* 118 Ohio St. 514; *Painesville Utopia Theatre Co.* v. *Lautermilch,* 118 Ohio St. 167; *Cooper* v. *State,* 121 Ohio St. 562.

In the second assignment of error, defendant claims that the trial court committed prejudicial error in ordering defendant to submit to the extraction of a blood sample from his body for comparison purposes.

We believe that this assignment of error is without merit on the basis of the holding by the U. S. Supreme Court in *Schmerber* v. *California,* 384 U. S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826.

The holding in that case is as follows. A state conviction of driving an automobile while under the influence of alcohol cannot be successfully attacked on the ground that the withdrawal of a blood sample from the defendant's body by a physician at a hospital at the direction of a police officer, after the defendant's arrest and despite his refusal, on advice of counsel, to consent to the test, and the admission in evidence of the report of the chemical analysis of the blood sample indicating intoxication denied the defendant due process of law under the 14th amendment of the U. S. Constitution where there was ample justification for the officer's conclusion that the defendant was involved in an accident.

Defendant claims that the trial court committed its

error in granting a pretrial motion ordering him to submit to the extraction of a blood sample. He cites *Schmerber* v. *California, supra,* as the basis for this alleged error.

The United States Supreme Court in *Schmerber* at pages 763, 764, states:

"It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. *Boyd* v. *United States,* 116 U. S. 616. On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it."

The court further stated, at page 770 in the opinion, the following:

"The requirement that a warrant be obtained is a requirement that the inferences to support the search 'be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' *Johnson* v. *United States,* 333 U. S. 10, 13-14; see also *Aguilar* v. *State of Texas,* 378 U. S. 108, 110-111. The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great."

The trial court on a motion of the prosecution ordered defendant to submit to the extraction of a blood sample by the county physician in a hospital. A hearing was had thereon with defendant and counsel present and it was ordered that either counsel could be present at the taking of the blood sample. Thus, more safeguards were given defendant than in the issuance of an ordinary search war-

rant. He was present with counsel and could voice his objections which he did.

We are not disposed to decide this case by placing labels upon various aspects of it. We believe that the requirement of the United States Supreme Court was met in that "inferences to support the search [were] * * * drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." (*Schmerber* v. *Calif., supra*, at 770.)

See *State* v. *Kiser*, 13 Ohio St. 2d 126; *Westerville* v. *Cunningham*, 15 Ohio St. 2d 121; and *State* v. *Starnes*, 21 Ohio St. 2d 38.

It has long been the view of the courts and of leading commentators that the privilege is limited to incriminating communications. Mr. Justice Holmes, speaking for the court in *Holt* v. *United States*, 218 U. S. 245 at 252-253, 54 L. Ed. 1021, 31 S. Ct. 2, stated the principle as follows.

"Another objection is based upon an extravagant extension of the 5th Amendment. A question arose as to whether a blouse belonged to the prisoner. A witness testified that the prisoner put it on and it fitted him. It is objected that he did this under the same duress that made his statements inadmissible, and that it should be excluded for the same reasons. But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof."

Professor Wigmore agrees with the above reasoning. He stated that "* * * the privilege is limited to testimonial disclosures. It was directed at the employment of legal process to *extract from the person's own lips* an admission of guilt, which would thus take the place of other evidence." 8 Wigmore, Evidence, Section 2263 (McNaughton rev. ed. 1961).

The following was noted in 1 Wigmore, Evidence, Section 149 (3rd ed. 1940).

"The presence upon the person or premises of articles, fragments, stains, tools, or any other resulting circumstance is constantly employed as the basis of an inference that the person did an act with which these circumstances are associated."

Wigmore further notes that "their relevancy is so patent that no occasion is given for rulings of law * * *." See *Downey* v. *United States* (10th Cir.), 263 F. 2d 552; *Patterson* v. *United States* (10th Cir.), 62 F. 2d 968; *Sheppard* v. *State*, 239 Ark. 785, 394 S. W. 2d 624; Anno., 35 A. L. R. 2d 856 (1954).

The basis for the trial court's order is contained in R. C. 2317.47, which reads in part as follows.

"Whenever it is relevant in a civil or criminal action or proceeding to determine the paternity or identity of any person, the trial court on motion shall order any party to the action and any person involved in the controversy or proceeding to submit to one or more blood-grouping tests, to be made by qualified physicians or other qualified persons not to exceed three, to be selected by the court and under such restrictions or directions as the court or judge deems proper."

The Supreme Court of Ohio has illuminated this subject in *Westerville* v. *Cunningham*, 15 Ohio St. 2d 121, wherein it said at page 122:

"Where a defendant is being accused of intoxication and is not intoxicated, the taking of a reasonably reliable chemical test for intoxication should establish that he is not intoxicated. On the other hand, if he is intoxicated, the taking of such a test will probably establish that he is intoxicated. Thus, if he is not intoxicated, such a test will provide evidence for him; but, if he is intoxicated, the test will provide evidence against him. *Thus, it is reasonable to infer that a refusal to take such a test indicates the defendant's fear of the results of the test and his consciousness of guilt,* especially where he is asked his reason for

such refusal and he gives no reason which would indicate that his refusal had no relation to such consciousness of guilt.'' (Emphasis supplied.)

''We conclude that, in the instant case, the defendant's refusal to take a chemical test for intoxication would have probative value on the question as to whether he was intoxicated at the time. This conclusion is supported by the recent decision in *State* v. *Cary* (1967), 49 N. J. 343, 230 A. 2d 384. See *People* v. *Sudduth* (1966), 65 Cal. 2d 543, 421 P. 2d 401, and annotation, 87 A. L. R. 2d 370 at 384 *et seq.* See also *People* v. *Ellis* (1966), 65 Cal. 2d 529, 421 P. 2d 393.

''We recognize that this conclusion is necessarily based upon the additional conclusion that the results of such a test would be reasonably reliable on the issue of intoxication.''

We wish to paraphrase a portion of the above statements to read as follows.

Where a defendant is accused of breaking and entering and is not guilty thereof, and blood of the culprit is found, the taking of a reasonably reliable chemical test for proof of such defendant's identity should establish that he is not guilty of the crime with which he is charged. On the other hand, if he is guilty and the blood test aids in the establishment of his identity, the taking of such a test will probably prove that he is guilty. Thus, if the blood test proves that he is not the guilty person, such a test will exonerate him; but, if the test shows that he is of the same type of blood as that found at the scene of the crime, it will provide evidence against him.

We must also recognize that the above conclusions are necessarily based upon the additional conclusion that the results of such a test would be reasonably reliable on the issue of the type of blood.

In presenting their positions, both parties in the *Cunningham* case apparently proceeded on the assumption that the proposed test that the defendant objected to taking would be reasonably reliable on the issue of blood type of

the one being tested. The court further stated, on page 124 of this opinion, the following:

"* * * The sole rationale for the rule against comment on a failure to testify is that such a rule is a necessary protection for the exercise of the underlying privilege of remaining silent. * * *

"*Schmerber* v. *California* (1966), 384 U. S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826, held that a defendant had no constitutional right to refuse to take a chemical test for intoxication."

The second paragraph of the syllabus in the above case is as follows.

"One accused of intoxication has no constitutional right to refuse to take a reasonably reliable chemical test for intoxication. (*Schmerber* v. *California*, 384 U. S. 757, followed.)"

In this connection see the opinion of Judge O'Neill, in *State* v. *Kiser*, 13 Ohio St. 2d 126.

When the defendant is required to submit to fingerprinting, photographing, measurement, to write or speak for identification to be used in court, to stand, to assume a stance, to walk or to make a particular gesture, no search warrant is required. Neither is one required where taken under similar conditions as those prevailing when the blood test herein was taken.

In *Westerville* v. *Cunningham*, 15 Ohio St. 2d 121, no search warrant was even mentioned as being required before the conducting of a blood test under R. C. 4511.191 (A).

R. C. 2317.47 states in part as follows: "Whenever it is relevant in a civil or criminal action or proceeding to determine the paternity or identity of any person * * *" a blood test may be conducted by court order.

To hold otherwise than the majority of the court has held, one would have to declare R. C. 2317.47 unconstitutional or hold that by the plain terms of the statute blood samples could never be taken. We believe this section applies to this case and is constitutional. What safeguards

would a search warrant provide that are not provided by this section of the code?

We believe that both the letter and the spirit of *Schmerber* were followed and hence this assignment of error is not well taken.

We now come to the third assignment of error. It is claimed that the blood taken from the floor of the feed store was so contaminated that the results of the tests introduced into evidence without a proper foundation first being laid was incompetent evidence.

We believe that this assignment of error is quickly and directly answered by stating that the expert called by the state did not have any difficulty in determining that the blood type of the blood spots found on the floor of the feed store and the blood types of the defendant were the same. The claimed contamination of the blood would not in any event change the blood type. This assignment of error, therefore, is without merit.

We come now to consider the fifth assignment of error. The defendant claimed intoxication as a defense in that it destroyed the intent necessary to the commission of the crime. However, defendant did not believe in the potency of this argument or in the efficacy of it to such a degree that he was willing to take the witness stand and subject himself to cross-examination. We are well aware of all of the rights of defendant under the Fifth Amendment to the U. S. Constitution, but if he desires to advance a defense such as this, he and he alone is the best source of evidence of his inebriation at the times the crimes were alleged to have occurred. The force of this argument did not impress the jury and neither does it impress us as the record is replete with the recitation of various conscious and normal acts performed by defendant immediately after the commission of the breaking and entering charged in the first count of the indictment. The burden was upon him and he failed to sustain it.

Generally, voluntary intoxication is no defense to the commission of a crime. The disability which he acquired from drinking liquor was within his own control and can-

not be classified as a mental illness excusing criminal responsibility.

We find that no error occurred in the trial of this case prejudicial to the rights of defendant. The judgment is affirmed.

*Judgment affirmed.*

ABELE, J., concurs.

STEPHENSON, J., dissenting. I would reverse the conviction of appellant upon the ground that there was a violation of his constitutional right to be free of unreasonable searches and seizures as embodied in the Fourth and Fourteenth Amendments to the United States Constitution.

The case cited in the majority opinion (*Schmerber* v. *California*, 384 U. S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826) to support the validity of the withdrawal of blood from the defendant over objections, requires an opposite conclusion from that reached by my colleagues.

The rationale of *Schmerber* has relevance here, first, because it definitely brings the withdrawal of a blood specimen from an accused within the prescriptions of the Fourth Amendment. The court stated at page 767:

"But if compulsory administration of a blood test does not implicate the Fifth Amendment, it plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment. That Amendment expressly provides that 'the right of the people to be secure in their *persons*, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *.' (Emphasis added.) It could not reasonably be argued, and indeed respondent does not argue, that the administration of the blood test in this case was free of the constraints of the Fourth Amendment. Such testing procedures plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of that Amendment."

Secondly, the holding that there was no infringement

of the defendant's constitutional rights under the Fourth Amendment was premised upon the recognition of the *emergency* that arises by quick dissipation of alcohol in the blood stream. The court said at page 770:

"The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence,' *Preston* v. *United States*, 376 U. S. 364, 367. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest."

*Schmerber* was premised upon the determination that the search without a warrant was reasonable because of an emergency and, indeed, this fact is the core of the decision. This is consistent with the following statement made at page 770.

"Search warrants are ordinarily required for searches of dwellings, and, *absent an emergency*, no less could be required where intrusions into the human body are concerned." (Emphasis added.)

There was no emergency under the facts of this case and, hence, a search warrant was required. The blood specimen sought by the prosecution was after the indictment of the accused and months after the alleged offense, and was sought for the purpose of determining the defendant's blood type for comparison with the type found at the scene of the crime. The blood type of an individual is constant in nature and one court has taken judicial notice of this well known scientific fact. See *Graves* v. *Beto* (D. C. Tex.), 301 F. Supp. 264.

The Court in *Schmerber*, recognizing it was writing

on a "clean slate" and formulating a new rule of constitutional law, deemed it necessary for that reason to conclude the opinion with the following cautionary language at page 772.

"That we hold today that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or *intrusions under other conditions.*" (Emphasis by writer.)

This, to me, is a clear warning not to do what in my view the majority ruling does, and that is to extend the *Schmerber* holding to a case completely dissimilar upon the facts.

R. C. 2317.47 appears to be drawn in sufficiently broad terms to authorize the test in question. R. C. 2317.47 was formerly Section 12122-2 of the General Code and was enacted in 1939 in 118 Ohio Laws 571. Whatever broad scope of freedom the Legislature possessed to enact this type of legislation in the pre-*Mapp* era, it ended in 1961 with *Mapp* v. *Ohio*, 367 U. S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684.

In *Ker* v. *California*, 374 U. S. 23, 10 L. Ed. 2d 726, the United States Supreme Court held that the standard of reasonableness made binding upon the states in *Mapp* v. *Ohio, supra*, was the federal standard under the Fourth Amendment. The Court further stated that *Mapp* v. *Ohio* did not mean a total obliteration of state law regulating searches, but only that *fundamental federal criteria must be met.*

It would logically follow that state procedure, whatever label that might be applied but in effect a defacto search warrant procedure, which incorporated required compliance with such federal criteria would be permissible. Needless to say, R. C. 2317.47 contains no such criteria.

The majority in this case upholds the search because it was ordered after some type of hearing (the details of which we are unaware because no record was presented to this court of what occurred) by the trial judge. While a neutral magistrate, required by the statute to be placed

between the police and the citizen, ordered the test, it is still an unlawful and unconstitutional invasion of appellant's rights, absent a determination of probable cause and the other constituent elements of the federal standard, even if somewhat dignified by court order. It is, at most, sheer speculation to say that "inferences to support the search" were drawn by the trial court under a statute not requiring them.

In *Graves* v. *Beto, supra,* a blood specimen was secured by deception from a suspect in custody upon a drunk charge for the purpose of matching the same with a specimen at a rape scene. The Federal District Court held there was no valid consent and, further, that a search warrant is required before a blood specimen can be secured from an accused. The decision was affirmed by the Court of Appeals of the Fifth Circuit in 424 F. 2d 524, and certiorari was denied December 13, 1970.

It is not necessary to determine if the statutes of Ohio are sufficiently broad to authorize a search by the withdrawal of blood from an accused, for even if they are not, that fact neither diminishes or alters the force of constitutional protection in this respect.

I am also of the view that the error cannot be said beyond a reasonable doubt to be harmless and, hence, I would reverse the trial court's decision. See *Harrington* v. *California*, 395 U. S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726.