The **STATE** of Ohio, Appellee,

v.

**PEARSON,** Appellant.

[Cite as *State v. Pearson* (1996), 114 Ohio App.3d 153.]

Court of Appeals of Ohio,
Third District, Seneca County.

No. 13–95–46.

Decided Oct. 4, 1996.

154

*Stanley Needles,* for appellant.

*Paul F. Kutscher, Jr.,* Seneca County Prosecuting Attorney, and *Kenneth H. Egbert, Jr.,* for appellee.

SHAW, Judge.

Defendant-appellant, Eric B. Pearson, appeals from a judgment of conviction and sentence entered in the Seneca County Court of Common Pleas, following a jury verdict finding defendant guilty of abduction, gross sexual imposition, attempted rape and rape.

On April 2, 1994, nineteen-year-old Stacie Schwab was abducted by a man while she was walking home from a party during the early morning hours. The man forcibly took Schwab to a wooded area, where he touched her breasts and vagina against her will. Schwab was then forced to engage in sexual intercourse and fellatio.

Following the rape, Schwab contacted the police and was taken to Tiffin Mercy Hospital, where she received treatment for her injuries and where a rape kit was administered. Following an investigation by the Tiffin Police Department, defendant became a suspect in this case and in another rape case, based upon similarities in the manner in which the rapes occurred and the description of the perpetrator.

On two separate occasions, blood was extracted from defendant, resulting in the discovery of a DNA match between the defendant and semen recovered from Schwab's clothing. The first blood sample was taken from defendant early in the investigation and prior to indictment as a result of an order issued by the trial court. The second blood sample was taken from defendant at a later date following the indictment as a result of a search warrant issued by a different judge, who allegedly had no knowledge of the first court-ordered blood test.

On April 10, 1995, defendant was indicted on one count of abduction with a specification of a prior aggravated felony conviction, two counts of gross sexual imposition, both with physical harm specifications, one count of attempted rape and two counts of rape, all three with specifications of a prior aggravated felony.

Prior to trial, defendant filed a motion to suppress evidence of his original blood sample and any evidence derived therefrom, and on August 16, 1995, the trial court denied it. On August 28, 1995, defendant's case proceeded to jury trial. On August 31, 1995, the jury found defendant guilty of one count of abduction, two counts of gross sexual imposition without physical harm to the victim, one count of attempted rape and one count of rape. Defendant was found not guilty of the second count of rape, but at a separate sentencing proceeding following the jury verdict, he admitted all specifications set forth in the indictment concerning his prior conviction for an aggravated felony.

On September 13, 1995, defendant was sentenced to eight to ten years incarceration for abduction, one and one-half years incarceration on each count of

gross sexual imposition, twelve to fifteen years incarceration for attempted rape and fifteen to twenty-five years for rape, all sentences to run concurrently.

Thereafter, defendant filed the instant appeal, asserting the following three assignments of error:

"I. May the State obtain blood samples from its citizens for any purpose without due process, and the requisites of establishing probable cause?

"II. The trial court should declare a mistrial when the State presents identification evidence not discovered to the defendant based to some degree on a photo array containing the defendant's picture and such information is not discovered until the witness has testified before the jury, and the defendant is not given an opportunity to file motions for hearings on the issue of the admissibility of that identification.

"III. The failure of the State to provide reports of scientific testing is prejudicial to the defendant as it precludes proper trial preparation to such an extent that the reports and testimony of such reports should be excluded."

■ Defendant's "assignments of error" do not conform to Loc.R. 11; however, in the interest of justice we will address them as such.

In defendant's first assignment of error, he contends that the trial court was required to conduct a hearing before ordering the taking of a blood sample. Moreover, defendant argues that the first blood sample was taken from him unlawfully because no search warrant was secured before it was taken. Defendant further argues that the second blood sample, which was authorized by a search warrant but not introduced at trial, and other evidence derived therefrom should be excluded because they were tainted by the first blood sample, which was taken unlawfully.

■ It is well established that the taking of a blood sample does not, in itself, violate the constitutional right to due process of law or the constitutional right prohibiting unreasonable searches and seizures. *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908. Moreover, R.C. 2317.47 provides that blood may be extracted from a person in a criminal case pursuant to a court order. However, a court order which authorizes a search and seizure of bodily fluids is certainly subject to the same constitutional safeguards which apply to any search and seizure. See *State v. McGrew* (1971), 25 Ohio App.2d 175, 54 O.O.2d 398, 268 N.E.2d 286. Thus, in the absence of exigent circumstances, blood may be extracted from a person only upon the issuance of a search warrant or its functional equivalent. *State v. Kutz* (1993), 87 Ohio App.3d 329, 335, 622 N.E.2d 362, 365–366; *Schmerber, supra.*

In *Schmerber, supra,* the Supreme Court upheld the warrantless extraction of blood from a drunk driving suspect because the delay necessary in obtaining a warrant threatened the destruction of the evidence. *Schmerber, supra,* 384 U.S. at 770, 86 S.Ct. at 1835–1836, 16 L.Ed.2d at 919–920. Thus, the court held that warrantless extraction of blood is permissible only when there is a "clear indication" rather than a "mere chance" that the blood will yield evidence that a crime has been committed. *Id.* The court further held that the test used to analyze the suspect's blood must be a reasonable one which does not involve undue risk, trauma, or pain and that the test must be performed in a reasonable manner. See, also, *State v. Holmes* (July 17, 1986), Ross App. No. 1163, unreported, 1986 WL 254.

With respect to the standard applicable to a warrant authorizing a bodily intrusion, courts have disagreed as to whether the quantum of evidence necessary is that of probable cause or a "clear indication that in fact such evidence will be found," as set forth in *Schmerber, supra.* See 2 LaFave, Search and Seizure (1996) 414, Section 4.1(e); see, also, *State v. Holmes, supra; State v. Dupree* (1995), 319 S.C. 454, 458–460, 462 S.E.2d 279, 282; *State v. Seibel* (1991), 163 Wis.2d 164, 471 N.W.2d 226.

In general, probable cause has been defined as "the probability, and not a prima facie showing, of criminal activity." *Illinois v. Gates* (1983), 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527, 546, quoting *Spinelli v. United States* (1969), 393 U.S. 410, 419, 89 S.Ct. 584, 590–591, 21 L.Ed.2d 637, 645–646; see, also, *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640. Probable cause for a search warrant exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates, supra,* 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548. In *State v. Holmes, supra,* the Fourth District Court of Appeals found that the *Schmerber* clear-indication standard requires a greater quantum of evidence than that required by probable cause. However, in *State v. Seibel* (1991), 163 Wis.2d 164, 178–180, 471 N.W.2d 226, 233, the Supreme Court of Wisconsin interpreted *Schmerber* to allow blood to be drawn incident to arrest as long as there is a *reasonable suspicion* that the blood contains evidence that a crime has been committed.

■ We are not persuaded however that the Supreme Court in *Schmerber* envisioned that the standard for the issuance of a search warrant for the taking of blood should be different than that required for the issuance of *any* search warrant. Thus, we will analyze the issuance of the court order and search warrant in the instant case under a probable cause standard.

The record in the instant case reveals that on August 22, 1994, the state, through the prosecuting attorney, moved for an order requiring defendant to submit to a blood test "in regard to a pending criminal investigation relating to

felony crimes." The motion contained no facts or assertions which linked defendant to any particular crime. At trial however, Lieutenant Michelle Craig of the Tiffin Police Department testified that defendant became a suspect on July 15, 1994 because of similarities between the Schwab rape and a rape which occurred on July 14, 1994. At the time the motion was filed, defendant was incarcerated in the Hardin County Jail on charges unrelated to this proceeding.

On August 23, 1994, the trial court issued a journal entry ordering defendant to submit to the withdrawal of blood samples. On September 12, 1994, due to defendant's incarceration in Hardin County, the state requested that the Hardin County Court of Common Pleas recognize the August 23, 1994 order issued by the Seneca County Court of Common Pleas. Accordingly, on September 12, 1994, the Hardin County Court of Common Pleas ordered defendant to submit to the withdrawal of a blood sample.

On September 12, 1994, a blood sample was taken from defendant by lab technician Stephen Van Dyne at Hardin Memorial Hospital, who then provided that sample to Lieutenant Michelle Craig, who placed it in evidence at the Tiffin Police Department. The sample was subsequently sent to the Bureau of Criminal Identification and Investigation ("BCI") for analysis. On April 10, 1995, defendant was indicted, and on May 10, 1995, defendant moved to suppress his September 12, 1994 blood sample and evidence derived therefrom. On June 19, 1995, Lieutenant Craig prepared and presented a search warrant containing a six-page affidavit to Judge Frederick Daniels of the Tiffin Municipal Court. The warrant sought to draw a second blood sample from defendant due to Lieutenant Craig's belief that defendant was a suspect in at least two separate rape investigations, including the one involving Schwab.

In Lieutenant Craig's affidavit, she described the details of her investigation into the Schwab rape and how the circumstances were similar to both an alleged rape and attempted rape which were subsequently committed on July 14, 1994. In the Schwab rape, the suspect was described as approximately five feet, six inches tall, with short hair, wearing a heavy jacket, gloves, and a bandanna over his face. The rape occurred at approximately 3:00 A.M., it involved both oral and vaginal penetration, and the rapist placed a bag over the victim's head during the rape. Following the rape, the suspect became very apologetic to the victim.

The affidavit further described the July 14, 1994 alleged rape of Theresa Tiell, where the suspect forcibly entered the victim's home at approximately 3:00 A.M., was described as wearing dark clothing and having a medium to thin build and wearing dark clothing and gloves. The suspect in that case placed a pillowcase over the victim's head, attempted oral and vaginal sex with the victim and became apologetic following the sex acts.

In addition, on July 14, 1994, approximately three hours after the Tiell incident, an individual driving a late 1980s blue Buick Park Avenue a short distance from the Tiell home pulled in front of an eighteen-year-old woman riding a bicycle, causing her to strike the car. The driver of the car got out of the car, became angry, and pushed the woman into a secluded wooded area. The man then got on top of the woman, who managed to escape unharmed. The Tiffin Police were notified by the Findlay Police Department that defendant had been stopped a few days prior to July 14, 1994 driving a 1986 dark Buick Park Avenue. A records check revealed that defendant had prior arrests and a rape conviction, from which he had been released on parole in 1993.

On June 19, 1995, based on the information set forth in the affidavit, the Tiffin Municipal Court issued a search warrant ordering the seizure of a blood sample from defendant. On the same date, a second blood sample was taken from defendant. The record does not indicate that the second blood sample was sent to BCI, subjected to DNA testing, or introduced into evidence at trial in this case.

On August 4, 1995, the trial court conducted a hearing on defendant's motion to suppress his September 12, 1994 blood sample. At the suppression hearing, Lieutenant Craig testified that all of the information in the affidavit attached to the June 19, 1995 search warrant had been available to her prior to the state's original August 22, 1994 request for a court order and that if the trial court had denied her first request for a court order to take blood from defendant, she would have attempted to secure a search warrant. Lieutenant Craig also testified regarding the information set forth in her affidavit attached to the June 19, 1995 search warrant authorizing the second blood test. Lieutenant Craig further revealed that at the time the search warrant was presented to the Tiffin Municipal Court, the court was advised that a suppression motion in the case was pending but was not told that a prior blood sample had been taken from defendant or that that blood sample was the subject of that suppression motion. Lieutenant Craig could not testify with certainty, however, that the court was unaware that blood tests had already been conducted.

In addition to Lieutenant Craig, Dr. Donald Shanabrook testified at the suppression hearing that the genetic characteristics of blood are the same even if the blood is taken in two separate samples.

On August 16, 1995, the trial court issued a journal entry denying defendant's suppression motion. The court found that the original September 12, 1994 blood sample was taken in an unlawful warrantless search. Nevertheless, the court held that the September 12, 1994 blood sample along with the second blood sample taken June 19, 1995 would have been ultimately or inevitably discovered during a lawful investigation. The trial court based its holding on both the testimony and affidavit of Lieutenant Michelle Craig, along with the fact that the

court believed that the June 19, 1995 search warrant for the second blood sample had been properly issued.

█ In addressing the September 12, 1994 blood sample taken from defendant, it is axiomatic that the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution require the police to obtain a warrant based upon probable cause *prior* to conducting a search. *State v. Brown* (1992), 63 Ohio St.3d 349, 350, 588 N.E.2d 113, 113–114. There are a number of exceptions to this rule, and in the context of a blood test, law enforcement officers may extract blood from an arrested suspect without a warrant when exigent circumstances require the immediate withdrawal of blood. *Schmerber, supra.*

█ As previously noted, the prosecuting attorney in this case moved for a court order requiring defendant to submit to a blood test. The trial court granted the motion and issued the requested order without a warrant and without any facts before it specifying the criminal activity allegedly involving defendant. Thus, the September 12, 1994 blood test of defendant was a warrantless search of defendant that was conducted pursuant to a court order without probable cause. A search conducted without the authority of a prior warrant that does not fit within a recognized exception to the warrant requirement is unreasonable *per se* and therefore illegal. *Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576; see, also, *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564.

The state does not assert that exigent circumstances required the taking of the first blood sample from defendant without a warrant. We therefore turn to an analysis of whether any other exceptions to the exclusionary rule are applicable to this case. The state first argues that the June 19, 1995 blood sample (second blood sample) was properly obtained, independently of the first blood sample, through a valid search warrant supported by probable cause. The state further argues that even assuming *arguendo* the September 12, 1994 blood sample was unlawfully seized, that sample as well as the June 19, 1995 blood would have been inevitably discovered through lawful investigative techniques. Finally, the state asserts that the first blood sample should be admissible in evidence because police relied in good faith on the order issued by the trial court permitting them to extract blood from defendant.

█ In addressing the propriety of the search warrant issued for the June 19, 1995 blood test, as we have previously noted, Lieutenant Michelle Craig submitted a six-page affidavit to Judge Frederick Daniels of the Tiffin Municipal Court, who apparently had no knowledge that a prior blood sample had been taken from defendant on September 12, 1994. The affidavit set forth the precise details of Lieutenant Craig's ongoing investigation of two rapes and an alleged attempted

rape involving similar circumstances, similar descriptions of the perpetrator and close geographic proximity. In her affidavit, Lieutenant Craig also linked defendant as a suspect based on the description of the vehicle defendant was driving at the time of the July 14, 1994 alleged attempted rape.

As previously noted, probable cause for a search warrant exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates* (1983), 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548. The duty of a reviewing court is to ensure that the magistrate issuing the search warrant had a substantial basis for concluding that probable cause existed. *Id.* at 238–239, 103 S.Ct. at 2332–2333, 76 L.Ed.2d at 548–549.

Upon careful review of the search warrant and the facts set forth in Lieutenant Craig's affidavit, we find that sufficient probable cause existed which justified the issuance of the June 19, 1995 search warrant authorizing the taking of blood from defendant. However, inasmuch as no other exception to the warrant requirement appears to apply to the taking of September 12, 1994 blood sample, we hold that the September 12, 1994 blood sample was unlawfully seized from defendant, and therefore, evidence of that sample should have been suppressed and excluded at trial. However, the June 19, 1995 blood sample was never introduced at trial, and, in fact, there is no indication in the record that this sample had been analyzed at the time of trial. Thus, the fact that it was properly obtained and perhaps *could have* been introduced at trial is of no consequence in this case since the blood sample which was actually introduced at trial was illegally obtained and should have been excluded by the trial court.

The state next argues the doctrine of inevitable discovery can be applied to the first blood sample in this case as an exception to the exclusionary rule. In addressing the doctrine of inevitable discovery, the Supreme Court of Ohio has stated:

"The ultimate or inevitable discovery exception to the Exclusionary Rule is hereby adopted so that illegally obtained evidence is properly admitted in a trial court proceeding once it is established that the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation. (*Nix v. Williams* (1984), 467 U.S. 431, [104 S.Ct. 2501], 81 L.Ed.2d 377, followed.)" *State v. Perkins* (1985), 18 Ohio St.3d 193, 18 OBR 259, 480 N.E.2d 763, syllabus.

The circumstances justifying application of this rule are most likely to be present if investigative procedures were already in place prior to the unlawful discovery of the evidence. *State v. Masten* (Sept. 29, 1989), Hancock App. No. 5–88–7, unreported, 1989 WL 111983. In substance, the state argues that Lieuten-

ant Michelle Craig would have seized an identical blood sample to the one which was obtained without a warrant pursuant to a lawful search warrant. We agree with the state's contention to the extent that a second blood sample was eventually obtained by the police through a valid search warrant based upon probable cause. However, the second blood sample, even if proven to be identical, was *never* introduced into evidence at defendant's trial. Moreover, as we stated in *State v. Masten, supra:*

"While there was undoubtedly sufficient probable cause to obtain a search warrant * * * in this case, we find that the mere fact that a search warrant would in all probability have been issued on request cannot be considered as the implementation of investigative procedures that would have ultimately led to the 'inevitable' discovery of the evidence. It seems to us that any other interpretation would pose a significant threat to the Fourth Amendment warrant requirement with its corollary magisterial determination of probable cause."

Similarly, as stated by the court in *United States v. Griffin* (C.A.6, 1974), 502 F.2d 959, 961:

"The assertion by police [after an illegal entry and after finding evidence of crime] that the discovery was 'inevitable' because they planned to get a search warrant * * * would as a practical matter be beyond judicial review. Any other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment."

We believe the same logic follows in the instant case. In other words, the state's argument would obviate any Fourth Amendment warrant requirement as long as it could be shown later that a warrant would in all probability have been obtained. The fact that the second blood sample *could have* or *would have* been admitted at trial does not change the fact that defendant's conviction was based on illegally obtained evidence. Moreover, the fact that a warrant was eventually issued cannot be considered as the implementation of investigative procedures which would have ultimately led to the discovery of the blood evidence. We therefore conclude that the September 12, 1994 blood sample is not admissible evidence that would have been "inevitably" discovered pursuant to a lawful search warrant.

Finally, we address the state's contention that evidence derived from defendant's illegally obtained blood sample is admissible under the good faith exception to the exclusionary rule. In *Massachusetts v. Sheppard* (1984), 468 U.S. 981, 987–988, 104 S.Ct. 3424, 3427, 82 L.Ed.2d 737, 743, the Supreme Court stated:

"[T]he exclusionary rule should not be applied when the officer conducting the search acted in reasonably objectively reliance on a search warrant issued by a

detached and neutral magistrate that is subsequently determined to be invalid * * *."

Moreover, in *United States v. Leon* (1984), 468 U.S. 897, 923, 104 S.Ct. 3405, 3420–3421, 82 L.Ed.2d 677, 698–699, the Supreme Court held that under the good faith exception to the exclusionary rule, suppression is an appropriate remedy if (1) the judge issuing the warrant was misled by false information, (2) if the judge issuing the warrant wholly abandoned his judicial role, (3) if the police officer claims to have relied on a warrant which was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant was so facially deficient that police could not "reasonably presume it to be valid." See *State v. George* (1989), 45 Ohio St.3d 325, 331, 544 N.E.2d 640, 646.

The state argues that it relied in good faith on R.C. 2317.47, which permits a trial court to order a blood test through a court order rather than a warrant. In *State v. McGrew* (1971), 25 Ohio App.2d 175, 54 O.O.2d 398, 268 N.E.2d 286, the court of appeals found that no search warrant was required for the taking of blood pursuant to R.C. 2317.47. However, the defendant in that case was already charged with a crime and the trial court conducted a hearing prior to the extraction of the blood sample with defendant's attorney present. In that case, the court found that the defendant was afforded *more* safeguards than those provided in the context of the issuance of an ordinary search warrant. The court concluded that the constitutional safeguards set forth in *Schmerber, supra,* were present prior to defendant's being ordered to submit a blood sample.

Here, in contrast, the state filed nothing more than a concise motion seeking to compel defendant to submit to a blood test "in regard to a pending criminal investigation relating to felony crimes." Although defendant was incarcerated in Hardin County in relation to other offenses, he had not been arrested or charged for any crimes in Seneca County, where the initial court order was obtained. The state contends that at the time it sought the first court order, it had knowledge of the information set forth in Lieutenant Craig's affidavit that was eventually attached to the June 19, 1995 search warrant. The state further contends that if the trial court had denied its August 22, 1994 motion, it *would have* applied for a search warrant and attached the information that was later presented in conjunction with the June 19, 1995 search warrant.

 Based on the foregoing, defendant was clearly not afforded the same constitutional safeguards as the defendant in *McGrew, supra,* in relation to execution of the·August 23, 1994 court order. The trial court had no information before it which tied defendant to any particular crime prior to issuing its court order. However, the state freely admits that it had a great deal of information relating to the investigation of defendant as a suspect in these crimes that could

have been presented to the trial judge but was not. We believe that the good faith required by *Leon, supra,* refers to the knowledge and information collectively possessed by the law enforcement community as a whole, as opposed to the arresting officer individually. *State v. Gough* (1986), 35 Ohio App.3d 81, 83, 519 N.E.2d 842, 845. We are unwilling to apply the good faith exception to a case such as this where the state possessed information that amounted to probable cause for a search warrant at the outset but inexplicably withheld that information from the trial court.

Moreover, pursuant to the *Leon* and *George* standards, we find that three of the four circumstances justifying suppression under the good faith exception to the exclusionary are present which bar any reasonable application of the good faith exception to this case. First, we believe that the motion and order on their face demonstrate that the trial court issuing the court order for the first blood sample wholly abandoned its judicial role in issuing it under the circumstances of this case. Secondly, we believe that the court order was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Finally, we find that the motion for the first blood sample was "so facially deficient" that the police could not reasonably presume it was valid and act upon it. Accordingly, the state's argument regarding the good faith exception to the exclusionary rule is without merit.

Based on the forgoing, we hold that the September 12, 1994 blood sample taken from defendant was unlawfully obtained without a warrant and that the trial court erred in not suppressing that evidence. Accordingly, we reverse the judgment of the trial court denying defendant's motion to suppress the September 12, 1994 blood sample. On the other hand, we hold that the June 19, 1995 blood sample was lawfully obtained via a search warrant based upon probable cause which was independent from and not tainted by, or the fruit of, the prior request or order for the September 12, 1994 sample. Accordingly, we affirm the judgment of the trial court denying defendant's motion to suppress his June 19, 1995 blood sample. Under these circumstances, we must reverse the judgment of conviction and sentence entered in the Seneca County Court of Common Pleas and remand this cause to the trial court for further proceeding consistent with this opinion according to law. Pursuant to App.R. 12(A)(1)(c), we decline to address defendant's remaining two assignments of error as they have been rendered moot by our disposition of plaintiffs' first assignment of error.

*Judgment reversed in part,*
*affirmed in part,*
*and cause remanded.*

BRYANT, J., concurs.

EVANS, J., dissents.

EVANS, J., dissenting.

I respectfully dissent in this case because I believe the trial court was correct in applying the ultimate-discovery exception to the exclusionary rule and refusing to suppress the evidence derived from the improperly obtained blood sample.

The United States Supreme Court, in *Nix v. Williams* (1984), 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377, announced an exception to the exclusionary rule, finding evidence properly admitted on the basis that it would ultimately or inevitably have been discovered even if no violation of any constitutional provision had taken place. The court noted:

"If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means * * * then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense." *Id.* at 444, 104 S.Ct. at 2509, 81 L.Ed.2d at 387–388.

The Supreme Court of Ohio adopted the ultimate- or inevitable-discovery exception to the exclusionary rule in *State v. Perkins* (1985), 18 Ohio St.3d 193, 18 OBR 259, 480 N.E.2d 763. Therefore, this exception to the exclusionary rule is the law in Ohio and if the disputed evidence falls within the exception it should be admitted in the trial of this appellant.

In *Nix,* the United States Supreme Court explained the rationale for the inevitable-discovery exception to the exclusionary rule as follows. The rationale for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct is that law enforcement officials must be deterred from violating constitutional and statutory protections, even though the cost of letting obviously guilty persons go unpunished imposes other societal costs. Therefore, the prosecution is not to be put in a better position than it would have been in if no illegality had occurred. By contrast, the independent-source doctrine, that is, allowing admission of evidence that has been discovered by means wholly independent of any constitutional violation, is justified on the basis that society's interest in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same position that they would have been in, not a worse one, if no police error or misconduct had occurred. Thus, although the independent-source doctrine did not apply in *Nix,* the Supreme Court determined that its rationale was consistent with, and justified adoption of, the ultimate- or inevitable-discovery exception to the exclusionary rule.

In the case before us, there is no question that the evidence derived from the blood sample would ultimately have been discovered. In fact, as the majority points out, the police had the information in hand to obtain a valid search warrant from the court which would have enabled them to lawfully secure the required blood sample when the first sample was improperly obtained. Admittedly, the police work at this point in the case was not the best. Nevertheless, the evidence to be obtained from a blood sample is still available and there can be no question that the evidence will ultimately be obtained by lawful means. In fact, the record confirms that the police have already obtained a blood sample from the appellant pursuant to a valid search warrant. As stated by one court of appeals:

"The inevitable discovery rule does not require certitude. It only requires 'that there be a very high degree of probability that the evidence in question would have been obtained independently of the tainted source.' *People v. Payton* (1978), 45 N.Y.2d 300, 313, 408 N.Y.S.2d 395, 402, 380 N.E.2d 224, 231." *State v. Ford* (1989), 64 Ohio App.3d 105, 112, 580 N.E.2d 827, 832.

The majority relies on *State v. Masten* (Sept. 29, 1989), Hancock App. No. 5–88–7, unreported, 1989 WL 111983, to reject the ultimate-discovery exception. I believe that its reliance is misplaced. In *Masten,* the disputed evidence consisted of a series of pictures kept in a locked file cabinet. The court rejected the argument that a search warrant would in all probability have been issued and that this should be accepted as the implementation of investigative procedures that would have ultimately led to the inevitable discovery of the evidence. This represents the best argument the prosecutor could devise to attempt to salvage important evidence which had been illegally obtained. The argument failed because of the element of speculation that the search warrant would have been issued and that the evidence would have been in the file cabinet when the warrant was executed. The case before us now is substantially different, in that the police had already done the investigation that could have produced a valid search warrant and, in fact, went to a judge with the results of their investigation (all of which was already in hand before any blood sample was taken) and secured a valid search warrant before the appellant was tried on the charges. This action removes any speculation that a warrant might not be issued. Furthermore, there can be no question that the evidence will still be available when the valid search warrant is executed. The blood sample is needed for DNA comparison. For this purpose, the blood sample from one individual never changes. A sample taken today and another sample taken next week will be identical. On these facts, there can be no question that the investigative procedures already completed would have ultimately led to the inevitable discovery of the evidence.

I conclude that the ultimate-discovery exception to the exclusionary rule applies. The majority in fact places the prosecution in a worse position at trial

because of police misconduct when the evidence gained would have ultimately been found in the absence of misconduct. Thus, the majority has improperly balanced the competing interest of deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime.

I would affirm the decision of the trial court that refused to suppress the evidence obtained from the blood sample secured from the appellant without a search warrant and uphold the conviction of the appellant.